UNITED STATES of America, Appellee,

v.

Michael FOSHER, Defendant, Appellant.

No. 77–1113.

United States Court of Appeals,
First Circuit.

Argued Sept. 7, 1977.

Decided Jan. 4, 1978.

**208**

Andrew Good, Boston, Mass., by appointment of the court, for defendant, appellant.

Robert B. Collings, Asst. U. S. Atty., Chief, Crim. Div., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, and CAMPBELL and TUTTLE,* Circuit Judges.

TUTTLE, Circuit Judge.

On June 1, 1976, the defendant, Michael Fosher, was indicted for armed robbery of a federally insured bank and assault of bank employees with a dangerous weapon.[1] Following a three-day jury trial, defendant was convicted of both defenses. He did not testify in his own defense. On appeal, defendant contends that the district court committed reversible error by admitting into evidence a "mug shot"[2] taken of him in connection with an earlier and unconnected arrest. Because the probative value of the mug shot in identifying the defendant as one of the robbers was outweighed by the potential prejudice flowing from its admission into evidence, we conclude that the defendant is entitled to a new trial. Accordingly, we reverse.

## I.

On the morning of May 12, 1976, the Commercial Bank and Trust Company of Burlington, Massachusetts was robbed by two armed men. Since both of the assailants wore masks over their faces during the entire episode, none of the bank employees were able to identify either of them.[3]

* Of the Fifth Circuit, sitting by designation.

1. The one-count indictment alleged violations of 18 U.S.C. § 2113(d). A superseding indictment charging defendant and his brother, Stephen Fosher, with the robbery was returned on September 21, 1976. At the close of evidence, the district court granted Stephen Fosher's motion for a new trial, and he eventually was retried and acquitted.

2. Mug shots normally "consist of side-by-side full face and profile photographs, with identification numbers on the bottom half and frequently with other markings." *United States v. Jackson,* 166 U.S.App.D.C. 166, 171, 509 F.2d 499, 504 n. 34 (1974) (citation omitted).

3. The government's first five witnesses—Jean Rose, Virginia Flaherty, June Alcott, Breda Callahan and Theresa Miller—were all employed by and present in the bank on the day of the robbery. Although these witnesses agreed that the robbers were young, white males, their trial testimony with respect to height, weight and dress differed in several respects.

Within the next two weeks, however, two individuals positively identified defendant as having been in the vicinity of the bank immediately prior to the holdup. At trial, the testimony of these two witnesses proved crucial to the government's case, which admittedly was based on purely circumstantial evidence. In order to illuminate both the evidentiary context in which the mug shot was introduced and the fragility of the government's other identification evidence, it is necessary to review this testimony in some detail.

The Commercial Bank and Trust Company is located in a small shopping center adjacent to and to the rear of a "Value King" supermarket. On the morning of the robbery, government witness Albert Rankin made a business call at the supermarket, parking his automobile in front of the store. At approximately 10:20 a.m., some ten minutes before the robbers struck, Mr. Rankin left the supermarket and returned to his vehicle. In the parking lot, Rankin came face-to-face with two individuals, one of whom he later identified as the defendant.[4] Significantly, Rankin later told police that defendant had been wearing a "wool, plaid mackinaw coat" and a "brown skullcap" rolled up on top of his head.[5] Following this brief, five-second encounter, Rankin re-

turned to the Value King and was unable to observe the men enter or depart the bank.

A short time after the robbery, Rankin accompanied a police detective to the Burlington police station where Rankin executed a written account of the events described above and provided a description of the individual whose face he had seen. Later in the day, after consulting an FBI Facial Identification Manual,[6] Rankin assisted local FBI agents in constructing a composite sketch.

Mr. Rankin was interviewed by Special Agent James Cullen, a member of the FBI's Bank Robbery Squad, some 10 days after the robbery. On that occasion, Agent Cullen displayed to Rankin an array of eight mug shots, from which Rankin selected a single picture.[7] This photograph, which had been taken of defendant at some point in the past, supposedly depicted the man Rankin saw near the bank.

■ At trial, Mr. Rankin described his chance encounter outside the bank and his various sessions with the police and FBI. On direct examination, Rankin not only testified with respect to a prior corporeal identification,[8] but also made a positive in-court identification of defendant. Apparently not content with this identification testimony, the government proceeded to question

---

4. Rankin was unable to identify the other man or to describe his clothing.

5. The five bank employees present in the bank at the time of the robbery corroborated Rankin's description of the face mask. In addition, one of the employees, Breda Callahan, testified that one of the robbers was clad in a plaid jacket. Thus, although Rankin was not in a position to see the two men enter the bank, his identification of defendant and the testimony of Ms. Callahan circumstantially established that defendant actually entered the bank and participated in the robbery.

6. The "FBI Facial Identification Manual" is a looseleaf compilation of photographs depicting various features of the human head and face. For example, a group of photographs denominated "Chin" is subdivided into several categories, including "Average," "Jutting," "Pointed," "Receding," and "Square." The witness simply selects the photograph which most accurately portrays each feature of the person sought to be identified and indicates that selec-

tion on an "FBI Facial Identification Sheet." By referring to the designated photographs, it is possible to make a composite sketch of the suspect's face.

7. The record indicates that in addition to meeting with Agent Cullen, Rankin perused some 50 mug shots at the Burlington Police Department on the morning of the robbery, but was unable to identify any of the persons portrayed. There is no indication, however, that defendant's picture was among those shown to Rankin at that time.

There is no suggestion on this appeal that Rankin's pretrial photographic identification was made under the type of impermissibly suggestive conditions condemned in *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1274 (1968) (substantial likelihood of irreparable misidentification).

8. Rankin had pointed out defendant during the course of a probable cause hearing conducted on May 28, 1976, 16 days after the robbery.

Rankin concerning his pretrial photographic identification. After corroborating Rankin's in-court identification by eliciting a detailed account of the meeting between Rankin and Agent Cullen,[9] the government tendered into evidence the mug shot of defendant and the remaining seven mug shots viewed by Rankin. Defendant's objection to the admission of these photographs precipitated .a brief exchange between the court and counsel, after which the photographs were marked for identification but not admitted into evidence. The record indicates that the sole reason the photographs were not received in evidence at this time was the appearance of certain written notations on the back of the prints.

On cross-examination, defendant's counsel launched a vigorous assault on virtually every aspect of Rankin's identification testimony. Significantly, Rankin admitted that (1) certain discrepancies existed between defendant's actual features and the facial characteristics previously described to the police;[10] (2) his identification of the defendant at the prior hearing had been qualified to the extent that defendant had longer hair than the man outside the bank; and (3) he had been reluctant to make a positive photographic identification of defendant because of the difference in hair length. Despite the obvious gains made during cross-examination, Rankin never recanted his in-court identification.

Upon initiating redirect examination, the government again offered the controversial mug shots. By this time, however, the government had masked certain portions of the photographs. A chest placard, which bore a police identification number, had been covered with tape, and the written notations on the back had been concealed by an index card stapled to the print itself.[11] The defendant again voiced an objection, arguing at a bench conference that

> [the] pictures [were] obviously mugshot-type pictures taken from a police mug-shot collection. And although . . . the numbers [were] blacked out, . . . the clear inference . . . [was] that [the defendant] and others in the pictures had been in trouble before.

These protestations proved unsuccessful, and the mug shots were admitted into evidence.[12]

The government next called Mary Barbato, who testified that she too had been in the vicinity of the bank on the morning of the robbery and, from a vantage point inside the Value King, had observed two young men walk in front of the store and toward the bank. Several minutes later, Mrs. Barbato observed the same two men burst through the front door of the bank, their arms laden with currency.

Later that morning, Mrs. Barbato examined some 50 photographs at the Burlington Police Department, but was unable to identify any of the persons portrayed. Within the next several weeks, however, Barbato

---

**9.** There was no objection to this line of questioning. Indeed, it is well settled that testimonial reference to pretrial photographic identification, elicited to buttress an in-court identification, is a "proper and strategically sound tactic." *United States v. Hines,* 470 F.2d 225, 228 (3d Cir. 1972), *cert. denied,* 410 U.S. 968, 93 S.Ct. 1452, 35 L.Ed.2d 703 (1973); *United States v. Clemons,* 144 U.S.App.D.C. 235, 237, 445 F.2d 711, 713, *cert. denied,* 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971).

**10.** Rankin was questioned extensively with respect to the selections he had made from the FBI Facial Identification Manual. Specifically, Rankin conceded that defendant's hair color, chin, eyebrows, and facial shape differed from his earlier description.

**11.** All eight of the mug shots were masked in the same fashion. Although the record indicates that the jury might inadvertently have been apprised of the fact that some alterations would be made before the photographs were admitted into evidence, see Part IV *infra,* it is clear that no alterations were actually performed in the jury's presence.

**12.** At the time the mug shots were admitted, defendant failed to request the court to instruct the jury with respect to the limited nature for which the evidence was admitted. In the absence of such a request, defendant cannot complain that an instruction was not given. *Dirring v. United States,* 328 F.2d 512, 515 (1st Cir.), *cert. denied,* 377 U.S. 1003, 84 S.Ct. 1939, 12 L.Ed.2d 1052 (1964).

made a photographic identification [13] and identified defendant at the probable cause hearing.

At trial, on direct examination, Mrs. Barbato positively identified defendant as one of the robbers and described in detail the various pretrial identifications she had made. After testifying with respect to her pretrial photographic identification, Barbato identified both the spread of mug shots shown to her by Agent Cullen and the mug shot she had designated as an accurate depiction of one of the robbers. These photographs were marked for identification, but were not offered into evidence.

On cross-examination, the mug shots previously marked for identification were introduced into evidence without objection as Defense Exhibits 8 and 9.[14] Exhibit 9 was the photograph Mrs. Barbato had identified as being one of the robbers. In response to defense counsel's questioning, she reaffirmed that the man appearing in Exhibit 9 robbed the bank. The record discloses, however, that Exhibit 9 was a photograph of one other than defendant and that Exhibit 8, the balance of the photographs exhibited by Agent Cullen, contained a photograph of defendant which Mrs. Barbato testified she had not selected. Thus, Mrs. Barbato incorrectly testified that Exhibit 9 was a photograph of defendant and that no photograph of defendant was contained in Exhibit 8.

The final government witness was Special Agent Cullen. Agent Cullen described his interview with Mrs. Barbato and, on direct examination, testified that although Mrs. Barbato had made some comment about the hair length of the person depicted in Exhibit 9, she had previously selected defendant's photograph. The photograph actually selected was identical to the mug shot previously identified by Mr. Rankin. The government then offered as Exhibit 11 a mug shot of defendant taken on May 21, 1976, the date of his arrest in connection with the robbery.[15] This photograph, admitted into evidence over objection, bore a fully-inscribed chest placard not appearing in the other mug shot. In addition, the length of defendant's hair was different in the two photographs. These obvious distinctions and the undisputed testimony that Rankin and Barbato had been shown photographs of the defendant prior to his arrest for the robbery concededly could have led the jury to infer that defendant had been photographed by the police in connection with an earlier offense.

## II.

It is a basic tenet of our jurisprudence that evidence of a criminal defendant's prior criminal acts, which are not charged in the indictment or information, is inadmissible when the defendant elects not to testify. *See United States v. Barrett,* 539 F.2d 244, 248 (1st Cir. 1976); *United States v. Forgione,* 487 F.2d 364, 366 (1st Cir. 1973), *cert. denied,* 415 U.S. 976, 94 S.Ct. 1561, 39 L.Ed.2d 872 (1974); Fed.R. Evid. 404(b).[16] This is but a specific in-

---

**13.** Eight days after the robbery, Mrs. Barbato met with Agent Cullen and scanned six photographs. There is no suggestion that the identification procedures employed by Agent Cullen were improper.

**14.** Although these mug shots were shown to the jurors and perhaps caused them to surmise that defendant previously had been arrested, the government does not now argue that defendant's action in this regard in any way diminished or neutralized the prejudice engendered by the government's earlier submission of similar photographs.

**15.** Although the record does not indicate why this photograph was offered into evidence, de-

fendant does not, and indeed cannot, argue that the photograph constitutes inadmissible evidence of a prior crime. The face of the photograph clearly indicates that it was taken at the time of defendant's arrest for the crime charged. *Cf. United States v. Calarco,* 424 F.2d 657, 661 (2d Cir.), *cert. denied,* 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 53 (1970).

**16.** *Accord, United States v. Yaughn,* 493 F.2d 441, 443 (5th Cir. 1974); *United States v. Harrington,* 490 F.2d 487, 490 (2d Cir. 1973); *United States v. Carter,* 157 U.S.App.D.C. 149, 150, 482 F.2d 738, 739 (1973). For a general discussion of this evidentiary principle, see R. McCormick, *Evidence* § 190 (Cleary ed. 1972), 1 F.

stance of the broader prohibition against permitting the government initially to place the defendant's character in issue. *See United States v. Fierson,* 419 F.2d 1020, 1022 (7th Cir. 1969); Fed.R.Evid. 404(a). Although the rule's underlying rationale has been explained in diverse terms,[17] it is undoubtedly accurate to summarize that

> [t]he inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudice one with a bad general record and deny him a fair opportunity to defend against a particular charge.

*Michelson v. United States,* 335 U.S. 469, 475–76, [69 S.Ct. 213, 218, 93 L.Ed. 168] (1948) (footnote omitted). Thus, the jury is required to determine a defendant's guilt or innocence of the crime charged solely on the basis of evidence relevant to that particular crime. A conviction should not be permitted because the jury believes the defendant to be a person of bad character or because of a notion that since he committed some other crime, he must also have committed the crime for which he is being tried. The wisdom and soundness of the rule are beyond dispute.

As is often the case, however, the general rule is not absolute. Several well-circumscribed exceptions exist as a result of judicial[18] and legislative pragmatism. The current approach, embodied in the Federal Rules of Evidence, provides that

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. *It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.*

Fed.R.Evid. 404(b) (emphasis added.) [19] Rule 404(b) is not exclusionary. Rather, it permits the introduction of prior-crimes evidence *unless* the sole purpose for the offer is to establish the defendant's propensity for crime. *United States v. Nolan,* 551 F.2d 266, 271 (10th Cir. 1977).[20] The admissibility inquiry, however, involves not simply a pigeonholing of proffered evidence within one or several of the specified categories. The problem of minimizing the dangers of prejudice without extensive sacrifice of relevant evidence cannot be resolved satisfac-

Wharton, *Criminal Evidence* §§ 242–48 (12th ed. 1955), and 1 J. Wigmore, *Evidence* §§ 192–94 (3d ed. 1940).

If the defendant chooses to take the stand or is responsible, without proper reason, for placing his prior record before the jury, different rules apply. *See United States v. Gimelstob,* 475 F.2d 157, 162 (3d Cir.), *cert. denied,* 414 U.S. 828, 94 S.Ct. 49, 48 L.Ed.2d 62 (1973).

17. *See, e. g., United States v. Brunson,* 549 F.2d 348, 359 (5th Cir. 1977); *United States v. Foutz,* 540 F.2d 733, 736 (4th Cir. 1976); *United States v. Bledsoe,* 531 F.2d 888, 891 (8th Cir. 1976); *United States v. Calvert,* 523 F.2d 895, 906 n. 11 (8th Cir. 1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976); 1 J. Wigmore, *supra* note 17, at § 194.

18. *See, e. g., Spencer v. Texas,* 385 U.S. 554, 560–61, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967); *Robinson v. United States,* 148 U.S.App.D.C. 58, 67, 459 F.2d 847, 856 n. 63 (1972); *United States v. Frascone,* 299 F.2d 824, 828–29 (2d Cir.), *cert. denied,* 370 U.S. 910, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962).

19. The Federal Rules of Evidence became effective on July 1, 1975. Prior to that time, in

*Dirring v. United States,* 328 F.2d 512, 514 (1st Cir.), *cert. denied,* 377 U.S. 1003, 84 S.Ct. 1939, 12 L.Ed.2d 1052 (1964), we held: " 'Evidence of other offenses may be received if relevant for any purpose other than to show a mere propensity . . . on the part of the defendant to commit the crime.' " The defendant in *Dirring* did not contend that the mug shots should be modified to minimize the likelihood of the jury's drawing an inference of prior criminal involvement or object to the manner in which the mug shots were introduced. He urged a per se exclusionary rule, an invitation we declined then as we do now.

20. This interpretation of the Rule finds support in its legislative history. As received from the Supreme Court, the Rule's second sentence began with the words "this subdivision does not exclude the evidence when offered." The Senate Committee on the Judiciary amended this language to read "it may, however, be admissible," with the express purpose of placing greater emphasis on admissibility. H.R.Rep.No. 93–650, 93d Cong., 1st Sess. (1973), *reprinted in* [1974] U.S. Code Cong. & Admin.News, pp. 7075, 7081.

torily by resort to so mechanical a process. The task is one of balancing, and if the probative value of the evidence does not outweigh the prejudice to the defendant that may result from its admission, such evidence must be excluded. *See United States v. Barrett,* 539 F.2d at 248; *United States v. Cepulonis,* 530 F.2d 238, 246 (1st Cir.), *cert. denied,* 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 834 (1976); *Dirring v. United States,* 328 F.2d at 515; Fed.R.Evid. 403.[21] This process of balancing is largely committed to the sound discretion of the district court, *United States v. Eatherton,* 519 F.2d 603, 611 (1st Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975), subject to reversal when this discretion has been abused.

### III.

As an initial proposition, we recognize that mug shots from a police department "rogues' gallery" are generally indicative of past criminal conduct and will likely create in the minds of the jurors an inference of such behavior.

> The double-shot picture, with front and profile shots alongside each other, is so familiar, from "wanted" posters in the post office, motion pictures and television, that the inference that the person involved has a criminal record, or has at least been in trouble with the police, is natural, perhaps automatic.

*Barnes v. United States,* 124 U.S.App.D.C. 318, 319, 365 F.2d 509, 510–11 (1966).[22] The government, however, often finds it necessary to introduce such photographs as part of its effort to identify the defendant and thereby prove its case. Indeed, the eviden-

tiary value of a pretrial photographic identification is extremely high. As the Supreme Court noted in *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967),

> the earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind.

*Id.* at 272 n. 3, 87 S.Ct. at 1956 (citation omitted). These conflicting interests—the government's need to introduce such evidence to prove its case, and the defendant's right to freedom from the possibility of conviction based on suspicion of other crimes—have created difficulties for the district courts, requiring on numerous occasions appellate consideration of the admissibility of mug-shot photographs. While each decision necessarily has turned on the particular factual setting presented, we discern several general principles from our reading of the cases.

In most instances, mug shots have been introduced to buttress or corroborate a witness' in-court identification, because of either doubts created during cross-examination, *see, e. g., United States v. Rixner,* 548 F.2d 1224, 1226 (5th Cir. 1977); *United States v. Gimelstob,* 475 F.2d 157, 162 (3rd Cir.), *cert. denied,* 414 U.S. 828, 94 S.Ct. 49, 38 L.Ed.2d 62 (1973); *United States v. Plante,* 472 F.2d 829, 831 (1st Cir.), *cert. denied,* 411 U.S. 950, 93 S.Ct. 1932, 36 L.Ed.2d 411 (1973), or a witness' hesitancy or inability to make a positive identification during trial. *See, e. g., United States v. Watts,* 532 F.2d 1215, 1217 (8th Cir. 1976);

---

**21.** Fed.R.Evid. 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Although the rule permitting the admission of other crimes evidence is couched in discretionary terms, *see* text accompanying note 20 *supra,* Congress intended that the district court exclude such evidence "only on the basis of those considerations set forth in Rule 403."

S.Rep.No. 93–1277, 93d Cong., 2d Sess. (1974), *reprinted in* [1974] U.S. Code Cong. & Admin. News, pp. 7051, 7071.

**22.** If it is more likely that the jury will assume that the photograph was taken at the time of defendant's arrest on the charges for which he is being tried, an assumption not possible in this case, the possibility of prejudice is, of course, more remote. *See United States v. Calarco,* 424 F.2d 657, 661 (2d Cir.), *cert. denied,* 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 53 (1970).

*United States v. Scott,* 494 F.2d 298, 301 (7th Cir. 1974); *Barnes v. United States,* 365 F.2d at 510. This Court previously has approved of both tactics. *See United States v. Plante,* 472 F.2d at 830; *Dirring v. United States,* 328 F.2d at 514–15; *cf. United States v. Barrett,* 539 F.2d at 248 (testimonial reference to prior criminal conduct). While the precise timing of the introduction has caused the courts little concern, that factor constitutes an integral component of a broader and more crucial inquiry—the government's need to introduce such photographs. The cases instruct that where other credible evidence is available to identify the defendant as the perpetrator of the crime charged, a substantial risk is involved in the introduction of mug shots. *United States v. Reed,* 376 F.2d 226, 228 n. 2 (7th Cir. 1967); *Barnes v. United States,* 365 F.2d at 510–11; *see United States v. Brunson,* 549 F.2d 348, 359–60 (5th Cir. 1977); *United States v. DiZenzo,* 500 F.2d 263, 265–66 (4th Cir. 1974).

The question which has provoked the most judicial comment concerns the physical appearance of the photographs themselves. Since it is the inference of prior criminal behavior created in the minds of the jurors which is sought to be avoided, the visual message conveyed by a ·photograph assumes heightened importance. In an area of the law fraught with necessarily imprecise standards, most courts have held that it is error for the prosecution, over objection, to display to jurors police photographs which, because of police or prison identification numbers or other written notations, clearly convey the fact of prior trouble with the law. *United States v. Scott,* 494 F.2d at 300–301; *United States v. Harman,* 349 F.2d 316, 318 (4th Cir. 1965). On the other hand, assuming the requisite probative value can be found, most courts have concluded that it is permissible to introduce such photographs over defense opposition if all incriminating indicia are concealed or removed. *See, e. g., United States v. Johnson,* 495 F.2d 378, 384 (4th Cir. 1974); *United States v. DeSena,* 490 F.2d 692, 696 (2d Cir. 1973); *United States v. Davis,* 487 F.2d 112, 121 (5th Cir. 1973),

*cert. denied,* 415 U.S. 981, 94 S.Ct. 1573, 39 L.Ed.2d 878 (1974); *United States v. Gimelstob,* 475 F.2d at 161. *But see United States v. Sawyer,* 504 F.2d 878, 879 (5th Cir. 1974) (per curiam), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 783 (1976) (implying that double-pose format alone requires exclusion). This presupposes, of course, that the photographs are masked in a competent fashion, outside the presence of the jury. *See United States v. Harrington,* 490 F.2d 487, 495 (2d Cir. 1973); *Barnes v. United States,* 365 F.2d at 511.

A final factor found to weigh heavily in the balance is the manner in which the photographic evidence is introduced. Comments or actions in connection with the proffer of a mug shot, which could lead the jury to infer that there is something extremely damaging or suspicious about the photograph itself, may inject reversible error into the trial. *See United States v. Harrington,* 490 F.2d at 495 (jury observed heated debate and an animated judge handling and pointing to photographs); *Barns v. United States,* 365 F.2d at 510 (trial judge informed jury of reluctance to permit viewing of photograph because jury might inadvertently remove covering).

■ Our careful consideration of these and other cases reveals that no court has yet adopted a per se rule to govern the introduction of mug-shot photographs. Because of the sensitive and competing interests involved, such an approach certainly would prove unsatisfactory. We do conclude, however, that there will normally exist three prerequisites to a ruling that the admission of these photographs does not amount to an abuse of discretion:

1. The Government must have a demonstrable need to introduce the photographs; and

2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and

3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs.

*United States v. Harrington,* 490 F.2d at 494. While it should be clear to all, we reiterate that this test presupposes that the photographs themselves are relevant to a material issue at hand. *See* Fed.R.Evid. 404(b). We now turn to an application of the delineated standards to the facts of the instant case.

### IV.

█ The first determination we are called upon to make is whether the government had a "demonstrable need" to introduce defendant's mug shot. At the time the photograph was introduced, the government already had elicited from Rankin a positive in-court identification. In addition, Rankin had testified that prior to trial, he had made both a photographic identification and a corporeal identification at the probable cause hearing. On cross-examination, however, Rankin admitted that he had been reluctant to make a positive photographic identification and that his identification during the probable cause hearing had been somewhat qualified. The value of Rankin's testimony was further eroded by his concession of inconsistencies between defendant's facial features and the description Rankin had provided on the FBI Facial Identification Sheet. The mug shot was introduced in an obvious effort to resurrect Rankin's identification testimony.[23]

The matter of identification was crucial to the government's case. Just as in *Harrington,* Rankin's identification of the defendant was "an integral element in the scheme of the Government's proof." 490 F.2d at 495.[24] We therefore conclude that the "demonstrable need" prerequisite has been met.

█ There can be little doubt that upon viewing the defendant's photograph the jury could have concluded that defendant had a prior record, since the photograph was clearly a mug shot. Although there were no testimonial references to the nature or source of the picture, the familiar double-pose format remained unaltered. The government's inartful masking of the other prejudicial features did little to dispel the message so vividly conveyed and could have heightened the jury's awareness of the picture's prejudicial nature. Very little effort is required to disguise the fact that a particular photograph was taken at the time of an arrest or imprisonment. All serial numbers can be excised, and the profile and frontal views can be separately pasted to exhibit sheets. *United States v. Watts,* 532 F.2d at 1217. When necessary, photographic copying can be employed. *United States v. Jackson,* 166 U.S.App.D.C. 166, 171, 509 F.2d 499, 504 n. 39 (1974). The failure to take such simple precautionary measures, which go far in protecting the defendant's right not to be convicted on the basis of evidence of another crime, clearly operated to focus the jury's attention on matters prejudicial to the defendant.

The final factor to be considered is the manner in which the photograph was intro-

**23.** Our inquiry into this component of the test necessarily must focus on the evidence of record at the time the photograph was actually received in evidence and displayed to the jury. Although the mug shot of defendant was admitted subsequent to a broadside attack on Rankin's credibility, we note that the government initially offered the photograph in connection with Rankin's testimony on direct examination. At that point, the need to introduce the mug shot itself was significantly less. While we decline to establish a per se prohibition of the use of otherwise admissible mug-shot photographs during the government's case-in-chief, we are compelled to caution that *normally*

the prosecution would be wise to preserve such evidence for rebuttal, after the defense

case has been sharpened and the judge may therefore more accurately consider the degree of relevancy and the potential for abuse. *United States v. Jones,* 155 U.S.App.D.C. 88, 92, 476 F.2d 533, 537 (1973) (per curiam), *citing United States v. Crawford,* 438 F.2d 441, 448 (8th Cir. 1971); *United States v. Adams,* 385 F.2d 548, 551 (2d Cir. 1967).

**24.** The testimony of Mrs. Barbato was not received until after the mug shot had been introduced. We believe it would be unwise, in view of the weakness of Rankin's testimony, to restrict the prosecutorial attempt to corroborate his testimony simply because the testimony of another witness, whose credibility was open to attack, might have tended to produce the desired result.

duced into evidence. The record indicates that at the time the evidence was finally admitted, the debate over the propriety of admission took place during a bench conference outside the jury's hearing. In addition, there is no evidence that either the government or the court made any comment with respect to the source of the photograph or defendant's prior confrontation with the police.

As previously indicated, however, the government's original proffer of the photograph came during its direct examination of Rankin. At that time, defense counsel objected and requested permission to approach the bench to state his objection. For reasons not clear from the record, the request was denied, whereupon the following colloquy ensued in full hearing of the jury:

Mr. Good: My objection is based on Rule 404 of the Federal Rules of Evidence.

The Court: Let me see the photograph, Mr. Collings.

Mr. Good: I would refer to all of them, your Honor, as well as the one he wishes to have specially marked.

The Court: I will examine them.

At this time, the envelope and within seven photographs may be marked C, for identification.

And the single photograph may be marked D, for identification.

At this time.

Mr. Collings: May I just cite a rule of evidence for your Honor's consideration? Mr. Good cited one, I would cite rule 801(d)1(c).

Which I think specifically covers this situation, if your Honor would?

The Court: 801 what?

Mr. Collings: 801(d)1(c). *I would also state, your Honor, I am not offering the reverse side of any of the photographs.*

The Court: *That's the reason I'm having them marked for identification here, because I assume you have not, but you cannot, as they are in the condition in which they are, the jury cannot see them without seeing the whole photograph.*

Mr. Collings: I would then leave it as it is, your Honor, and—

The Court: At this time, it may be marked for identification.

*If you can present it in such a manner that only that which you seek to offer, may be shown to the jurors, that is another matter.*

Mr. Collings: Thank you, your Honor, I will do that.

The Court: *In other words, much more is being offered by the profer [sic] of these photographs than you intend.*

Mr. Collings: *I understand that and I will seek to correct that and offer them at a later time.* [emphasis added.]

Although some period of time elapsed between this discussion and the point at which the photograph was actually admitted into evidence, it is unlikely that the jury failed to make the connection. Rather, it is more probable that the comments of both the government and the court further accentuated the unique character of the photograph. To be sure, the government made it clear that the picture would be altered in some fashion before being offered again.

■ Without grounding our resolution of defendant's contention on this element of our tripartite test, we would be remiss were we not to caution all concerned that serious risks are involved in discussing the admissibility of mug shot photographs in front of the jury. The preferable approach, of course, would be to require a proffer of the evidence and rule on its admissibility out of the hearing of the jury. Such action not only will shield the jury from potentially inadmissible prejudicial evidence, but also will enable the trial judge to determine whether it would be desirous to defer admitting the evidence until some later point in the proceedings. Considering the important rights at stake and the likelihood of prejudice involved, we feel it appropriate to recommend such a protective procedure.

## V.

The test we have outlined is a difficult one to apply, requiring as it does an inher-

ently imprecise determination of the impressions conveyed to jurors through photographic evidence. In the circumstances of this case, however, in which the evidence of defendant's guilt was less than overwhelming, we hold that the district court abused its discretion in admitting a photograph which on its face implied prior criminal conduct on defendant's part. While the photograph was not without probative value, this value was substantially outweighed, Fed.R.Evid. 403, in the circumstances of this case, especially as the pictures could easily have been modified so as to avoid characteristics which would cause the jury to identify the defendant as having a prior record. The masking that was attempted was so inartful and incomplete as merely to invite the jury's attention to these prejudicial matters.[25]

REVERSED and REMANDED for a new trial.

---

**25.** We realize that cropping, retouching or photographing of an original mug shot so as to disguise its nature may give rise to problems when the picture is offered into evidence. For example, the witness may have difficulty identifying the altered picture as the photo he was once shown. In many cases the problem may be avoided by a simple stipulation that the picture is in relevant respects a copy of that shown to the witness, or by other courses worked out between the parties in advance. The defense can be expected to cooperate, as it has the paramount interest in avoiding the prejudice which the unedited original would create. Unreasonableness by a defendant in cooperating so that the edited copy can go into evidence would be a factor to be considered by us in passing upon the question of reversible error.

If the defense feels that the disguising of a picture is more prejudicial than introduction of the original, it is fully entitled to require that the jury see the undoctored original; editing is for the benefit of the defense.

Finally, as noted, while editing should be the normal procedure and should be undertaken whenever, as here, it is both feasible and appropriate, we recognize that there may be cases where the photo is of probative value only if presented in its original form. In such case, if the district court finds that the probative value of introducing the photo outweighs the prejudice, it should act as it deems proper under the standard of Rule 403. We emphasize, however, that whenever effective masking is feasible, it is to be done.