**UNITED STATES, Appellee,**

v.

**Patrick M. CANNON,
Defendant, Appellant.**

**No. 89–1710.**

United States Court of Appeals,
First Circuit.

Heard Feb. 7, 1990.

Decided May 18, 1990.

Charles P. McGinty, Federal Defender Office, for defendant-appellant.

Martin F. Murphy, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., was on brief, for appellee.

Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and SELYA, Circuit Judge.

BOWNES, Senior Circuit Judge.

Defendant appellant Patrick M. Cannon appeals from a jury verdict finding him guilty of bank robbery in violation of 18 U.S.C. § 2113(d). The indictment charged that defendant carried out the robbery "by means of a dangerous weapon: to wit, a handgun." There was evidence from

which it could be found that the defendant used a plastic gun for carrying out the bank robbery.

Four issues are presented on appeal: (1) whether the jury verdict was ambiguous; (2) the court's ruling and instruction on what constitutes a dangerous weapon under the statute; (3) the admission into evidence of a group of six photographs; and (4) the district court's selection of the foreperson of the jury.

### 1. *The Verdict*

■ The court instructed the jury on the elements of the crime of armed bank robbery, 18 U.S.C. § 2113(d). At the request of defense counsel, it also gave an instruction on the lesser included offense of unarmed bank robbery, 18 U.S.C. § 2113(b).[1] Defendant argues that the verdict was ambiguous because the verdict slip used by the jury provided for only two findings, "guilty" or "not guilty" with no reference to the lesser included offense of "unarmed bank robbery," which had been specifically instructed in the charge. Defendant contends that such ambiguity requires a new trial. We agree that if the verdict was ambiguous, a new trial is required. *United ed States v. Kavazanjian,* 623 F.2d 730, 739 (1st Cir.1980) (citing *Yates v. United States,* 354 U.S. 298, 311–12, 77 S.Ct. 1064, 1072–73, 1 L.Ed.2d 1356 (1957)); *see also United States v. Moynagh,* 566 F.2d 799, 804 (1st Cir.1977), *cert. denied,* 435 U.S. 917, 98 S.Ct. 1475, 55 L.Ed.2d 510 (1978).

Appellant states in his brief at page 8: "The trial court's use of a general verdict slip, after instructing the jury on the offenses of armed and unarmed bank robbery, is reversible error." Our first problem with defendant's contention is that there is no record that the jury used a general verdict slip to return its verdict.

Nor is there any indication that the court used a verdict slip to record the verdict. There is nothing in the case file or trial transcript referring to a jury slip or verdict form. There was no mention of a jury slip or verdict form during the charge conference at the close of the evidence. During the charge, the court did not refer directly or indirectly to a verdict slip that was to be used or even referred to by the jury. To the contrary, the court instructed the jury that the verdict was to be given orally in response to questions from the clerk. The instruction on how the verdict was to be returned was as follows:

> As you know, Mr. Foreman, there will be a Deputy United States Marshal on security duty at the foot of the stairs leading to the jury room. When you have arrived at a unanimous verdict, Mr. Foreman, you will notify the Marshal that the jury is ready to return its verdict.
>
> You will then return to the courtroom and remain standing. At that point Ms. Veneto will first ask you, Mr. Foreman, if the jury has agreed on a unanimous verdict. After you advise her that the jury has done so, she will next inquire as to your verdict. She will say, What say you, Mr. Foreman, is the defendant guilty or not guilty as charged in Count 1? *And you will respond orally with whatever the verdict is.*

(Emphasis added).

After the charge, defense counsel mistakenly objected to the failure of the court to give the lesser included offense instruction, which he had requested. He now agrees that the instruction was given. The following colloquy took place.

> Finally, your Honor, with respect to lesser included offense, your Honor indicated you would be giving instructions 1

---

1. 18 U.S.C. § 2113(b) provides:
   (b) Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $5,000 or imprisoned not more than ten years, or both; . . .

18 U.S.C. § 2113(d) provides:
   (d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined no more than $10,000 or imprisoned not more than twenty-five years, or both.

through 7, which the defendant requested, one of which was regarding the lesser included offense. Your Honor didn't give it. I would ask your Honor to give it, since it is consistent with the evidence in the case. It is instruction No. 4. Right here (indicating).

THE COURT: I gave the substance of 4.

MR. McGINTY: But that is not even contained on the jury verdict. I listened carefully and didn't hear it in the instructions.

THE COURT: I gave the substance of your No. 4.

MR. McGINTY: It is not included as part of the jury verdict. I mean the jury has no way. They are instructed by the Court to either come back with an up or down on the armed bank robbery.

THE COURT: All right. If they come up or down I will ask them about the second one at that point.

MR. McGINTY: I object. They should go in and consider once—not consider what the accusations are. They should not do it after they come back.

THE COURT: I will not say anything more on that.

We point out that there is no mention in the colloquy of a jury slip or written questions to be answered. We do not, however, rule out the possibility that defense counsel's reference to "the jury verdict" meant jury slip.

The foreman of the jury returned the verdict as the court had instructed:

THE CLERK: Mr. Foreman and members of the jury, have you reached a unanimous verdict?

THE FOREMAN: Yes, we have.

THE CLERK: As to Count 1, is the Defendant, Patrick Cannon, guilty or not guilty, as charged [sic]?

THE FOREMAN: Guilty, as charged.

THE CLERK: Mr. Foreman, you, upon your oath, say the Defendant, Patrick Connon, [sic] is guilty. So say you?

THE FOREMAN: That is correct.

THE CLERK: So say you, Mr. Foreman, and so say you, members of the jury?

There is no reference in the record to a verdict slip being handed to the courtroom clerk. After the verdict was given orally, defense counsel requested that the jury be polled, and it was. Defense counsel did not suggest to the court that the verdict was ambiguous or that the jury be asked whether it considered the lesser-included offense.

In his brief defense counsel states: "Undersigned counsel, in preparing this appeal, searched both the District Court and the Court of Appeals files in this case and did not find the verdict slip. As a result, counsel for the government and defendant have entered into a stipulation, pursuant to Rule 10(e), Fed.R.App.Pro.,...." Appellant's Brief at 9, n. 5. The stipulation provides:

1. The verdict slip used to record the jury's verdict in this case is not in the record, having been misplaced and presumably lost.

2. The verdict slip simply provided a place for the jury to check "guilty" or "not guilty" without specifying either armed or unarmed bank robbery. The jury endorsed the verdict by checking the space next to the word "guilty".

We have several comments. First, it is clear from the record that a verdict slip was not used to record the jury's verdict. The verdict was recorded, as is done in most criminal cases, by the foreperson orally answering questions asked by the courtroom clerk and the court reporter recording the questions and answers. The first part of the first sentence of the stipulation is, therefore, incorrect. In light of the record and particularly the omission in the charge of any reference to a jury slip, we do not think that it can be assumed that such a slip was "misplaced and presumably lost." There are two other possibilities: that there was no verdict slip; or if there was one, it was ignored by the jury, discarded and not used.

Although we are not bound by a stipulation that is contrary to the record, we will assume that there was a verdict slip as

described therein and that it was used by the jury. Defendant relies on *United States v. Barrett*, 870 F.2d 953 (3d Cir. 1989), in support of his contention that the verdict was ambiguous and a new trial is required. In *Barrett*, the defendant was charged in Count I with conspiracy to commit five object offenses against the United States; two of the object offenses were felonies, one could have been either a felony or misdemeanor, and the other two object offenses were misdemeanors. Count IX charged defendant with a substantive felony. While the jury was deliberating the district court called it back and at defendant's request, gave a "lesser included offense" instruction on both counts. The jury was given verdict slips prepared by the judge to record its verdict. The slips merely provided a space to check guilty or not guilty. Defense counsel requested more specific jury slips, giving the jury a third alternative of guilty on a lesser included offense as to both counts. The request was denied. The jury returned a general verdict of guilty on both counts. Because the court did not know whether to sentence the defendant for felonies or misdemeanors it submitted special interrogatories to the jury. Based on the jury's answers, defendant was sentenced for committing felonies on both counts.

In finding that the verdict was ambiguous, the court of appeals held: "Thus, when the jury marked guilty on the verdict slip, it could mean that it was convicting defendant either on the charged offense or the lesser included offense. The ambiguity in the verdict was thus manifest and constituted reversible error." *Id.* at 955. As authority for its holding, the court cited 1 F. Devitt and C. Blackmar, *Federal Jury Practice and Instruction*, § 1805 at 584 (3d ed. 1977):

> When [a] jury is instructed on a lesser-included offense and it returns a general verdict of guilty, the verdict is fatally ambiguous and the case will be remanded for new trial. *Glenn v. United States*, 137 U.S.App.D.C. 120, 420 F.2d 1323 (1969). This problem can be avoided by furnishing verdict forms to the

jury which leave no doubt as to what the jury has determined.

870 F.2d at 955.

We turn next to the case cited by Devitt and Blackmar, *Glenn v. United States*, 420 F.2d 1323 (D.C.Cir.1969). The facts are, in contrast to Barrett, straightforward.

> Appellant was placed on trial before a jury in the District Court on a single count of housebreaking. The jury, instructed on the elements of housebreaking and of unlawful entry as a lesser included offense, rejected appellant's insanity defense, returned a one-word verdict of "guilty," and this single word each of the jurors repeated when polled. Though the verdict thus failed to specify which of the two offenses this finding related to or whether it related to both, no one sought clarification from the jury before its discharge.

*Id.* at 1324 (footnotes omitted). The defendant was convicted of housebreaking by the trial judge. The circuit court found the verdict ambiguous and remanded for a new trial. During the course of its opinion, the court observed:

> The presumption the Government espouses interprets the jury's general verdict of guilty by ultimate reference back to the indictment alone. This may be an acceptable course where the jury returns a verdict of "guilty as charged," or merely a verdict of "guilty" where neither the indictment nor the court's charge to the jury mentions more than one crime, or more than one degree of a single crime. In the case at bar, however, there is nothing to reliably indicate that the jury's verdict was intended to refer to the indictment rather than to the judge's charge, which defined for the jury two different offenses.

*Id.* at 1325 (footnotes omitted).

■ We now turn to the case at bar. After giving clear and comprehensive general instructions, the court told the jurors that the indictment "will go to the jury room with you" (and it did). It then read the indictment to the jury. After doing so, the court meticulously explained the elements of the crime charged in the indict-

ment and what the government had to prove beyond a reasonable doubt in order for the defendant to be found guilty as charged in the indictment. This was followed by the "lesser included offense" instruction of simple bank robbery.

As already noted, the foreperson of the jury was asked by the courtroom clerk: "As to Count 1, is the Defendant, Patrick Cannon, guilty or not guilty, *as charged?*" (Emphasis ours). The reply was: "Guilty, *as charged.*" (Emphasis). The crime charged in the indictment was that:

> On or about September 2, 1988, at Boston, in the District of Massachusetts, Patrick M. Cannon, the defendant herein, did by force and violence and by intimidation take from the person and presence of employees of the Haymarket Cooperative Bank, 280 Atlantic Avenue, Boston, Massachusetts, approximately $4,844.00 in money belonging to and in the care, custody, control, management and possession of said Haymarket Cooperative Bank, the deposits of which were then insured by the Federal Deposit Insurance Corporation; and in committing the aforesaid offense, Patrick M. Cannon did assault and put in jeopardy the lives of other persons by the use of a dangerous weapon, to wit: a handgun.

We can only conclude, by the foreperson's answers to the courtroom clerk's question, that the jury intended to find the defendant guilty as charged in the indictment. The indictment had been read to the jury as part of the charge and the jury had it in the jury room during its deliberations. The unequivocal oral response by the foreperson in the presence of the other jurors, who were subsequently polled, effectively nullified any equivocal finding on the missing jury slip. We think that the reasoning of *Glenn* applies and that the facts of *Barrett* make it inapplicable here. We hold that regardless of whether or not a jury slip was used, the verdict was not ambiguous.

## 2. The "Gun" Issue

Defendant next challenges his conviction on the ground that his use of a toy gun during a bank robbery cannot support a charge of armed bank robbery under 18 U.S.C. § 2113(d) because the use of a toy gun is not "the use of a dangerous weapon or device" as required by the statute. In his brief, defendant states: "The court erred in finding that a toy gun constituted a 'dangerous weapon' under 18 U.S.C. § 2113(d)." Brief at p. 11. In fact, there was no such explicit finding. The district court did deny defendant's motion for judgment of acquittal on the ground that a toy gun was used during the robbery and that this was not sufficient for a charge of armed bank robbery. The court also denied defendant's request for a jury instruction to that effect. We will assume that defendant is arguing that these rulings amounted to the finding that defendant mistakenly asserts was made.

Defendant's argument on this issue is premised on the assumption that a toy gun was used during the robbery. There was evidence that an imitation plastic gun was used, but there was also evidence from which it could be found that the defendant used a real gun. We first point out that there is no reference in the record to a "toy" gun. The word "toy" is first used to describe the gun in the appellate briefs of the parties. And there is nothing in the record suggesting that the gun used in the robbery was the kind of a toy that would be recognized immediately as such.

We now turn to the evidence in the record. Laura Ursino, assistant branch manager of the bank that was robbed, testified that she looked up, "and there was someone wearing a ski mask and holding a gun, and he demanded the money." She described the gun as looking like an automatic, being of medium length and "probably" black. She was asked, "Did you believe that the gun was a real gun?" Her reply was, "Yes, definitely." One of the tellers, Joyce Indorato, testified, "I looked up and there was a man standing there with a ski mask with a gun." Both witnesses testified that they were scared and frightened by the robber. The government's chief identification witness, John Newman, testified that he noticed a man

leave the bank, "wearing a ski mask, carrying a gun, and had a bank bag in his hand." This testimony was certainly sufficient for a finding of armed bank robbery.

There was testimony by defendant's girlfriend that when she visited him in Vermont after the robbery, she saw a black plastic gun in his room, and defendant told her that he had used a plastic gun in the robbery. She further testified that the defendant threw the gun out the window of the car on the way back from Vermont. The jury, of course, could have found from this testimony that defendant used a plastic gun to carry out the robbery. But this testimony did not prove conclusively that a plastic gun had been used. The statements attributed to defendant were self-serving to some extent and the jury could have disbelieved them. It also, of course, could have disbelieved entirely the testimony of defendant's girlfriend.

The district court's instruction correctly reflected the ambiguity of the gun testimony:

> In order to meet its burden of proof on the charge of armed bank robbery, the Government must prove beyond a reasonable doubt that during the commission of the bank robbery the defendant assaulted another person with a dangerous weapon.
>
> *   *   *   *   *   *
>
> If you find beyond a reasonable doubt that the defendant displayed what looked like a dangerous weapon during the robbery, you may find the defendant assaulted another person. If you find beyond a reasonable doubt that the defendant displayed a weapon, you need not find that the weapon was real or was loaded. The law requires only that the defendant used a dangerous weapon, not that the weapon be loaded or actually be capable of firing. A weapon may be dangerous if it instills fear in the average citizen, creating an immediate danger that a violent response will follow.

There can be no doubt that this instruction was legally correct. As the district court noted, there is a Supreme Court case directly on point. In *McLaughlin v. Unit-*

*ed States*, 476 U.S. 16, 106 S.Ct. 1677, 90 L.Ed.2d 15 (1986), the question was "whether an unloaded handgun is a 'dangerous weapon' within the meaning of the federal bank robbery statute." *Id.* at 16, 106 S.Ct. at 1677. Writing for a unanimous court, Justice Stevens stated:

> *Three reasons, each independently sufficient*, support the conclusion that an unloaded gun is a "dangerous weapon." First, a gun is an article that is typically and characteristically dangerous; the use for which it is manufactured and sold is a dangerous one, and the law reasonably may presume that such an article is always dangerous even though it may not be armed at a particular time or place. *In addition, the display of a gun instills fear in the average citizen;*[3] *as a consequence, it creates an immediate danger that a violent response will ensue.* Finally, a gun can cause harm when used as a bludgeon.
>
> ---
>
> [3] The floor debate on the provision that became § 2113(d) indicates that Congress regarded incitement of fear as sufficient to characterize an apparently dangerous article (such as a wooden gun) as "dangerous" within the meaning of the statute. See 78 Cong.Rec. 8132 (1934) (colloquy among Reps. Sumners, Blanton, and Dockweiler).

*Id.* at 17–18, 106 S.Ct. at 1678 (emphasis added).

Recently, the Ninth Circuit, in *United States v. Martinez–Jimenez*, 864 F.2d 664 (9th Cir.), *cert. denied*, — U.S. ——, 109 S.Ct. 1576, 103 L.Ed.2d 942 (1989), faced a challenge to a conviction under 18 U.S.C. § 2113(d) that is identical to that offered by the present defendant. Responding to the argument that a toy gun could not support an armed robbery conviction, the court looked to the decision in *McLaughlin* and stated:

> A robber who carries a toy gun during the commission of a bank robbery creates some of the same risks as those created by one who carries an unloaded or inoperable genuine gun. First, the robber subjects victims to greater apprehension. Second, the robber requires law enforcement agencies to formulate a more deliberate, and less efficient, re-

sponse in light of the need to counter the apparent direct and immediate threat to human life. Third, the robber creates a likelihood that the reasonable response of police and guards will include the use of deadly force. The increased chance of an armed response creates a greater risk to the physical security of victims, by-standers, and even the perpetrators. Therefore the greater harm that a robber creates by deciding to carry a toy gun is similar to the harm that he creates by deciding to carry an unloaded gun.

*Id.* at 666–67. We agree with the Ninth Circuit. *McLaughlin* mandates that we reject defendant's challenge to his conviction on the "gun" issue.

### 3. *Admission of Photographs*

■ After defendant rested, the government requested that a group of photographs, including one of the defendant, be admitted into evidence. The array consisted of individual, front-view, head-and-shoulder shots of six young, white men. Eight days after the robbery, these photographs were shown to John Newman, a bystander at the scene who later became the government's chief identification witness. Newman pointed to defendant's picture as that of the robber. At trial, the government sought to introduce the photographs as evidence of a pre-trial identification because it thought that defendant had undermined Newman's in-court testimony, and therefore, jeopardized the government's case. Over defendant's objection, the district court admitted the array.

Defendant contends that the jury could not help but recognize the photographs as police mug shots, even though when introduced at trial they had been cropped to remove the height markings and prisoner numbers. Since the photo of defendant had been shown to Newman prior to defendant's arrest for the bank robbery, defendant argues that it told the jury he had a preexisting criminal record. Pitching his argument on *United States v. Fosher,* 568 F.2d 207 (1st Cir.1978), he contends that allowing the array was an abuse of discretion warranting reversal. We disagree.

In *Fosher,* we overturned a defendant's conviction of armed bank robbery because a photograph admitted into evidence clearly implied he had engaged in prior criminal conduct. We found that the probative value of the photograph was outweighed by the prejudice against the defendant. Without adopting a "per se rule" governing the admission of mug-shot photographs, we stated that "there will normally exist three prerequisites to a ruling that the admission of these photographs does not amount to an abuse of discretion." *Id.* at 214. They are:

1. The Government must have a demonstrable need to introduce the photographs; and

2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and

3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs.

*Id.* Thus, in order to decide whether the district court abused its discretion, we must examine not only what was submitted but why and how.

The first question is whether the government had a "demonstrable need" to introduce the photographs. The government's chief identification witness at trial was John Newman, a Boston Herald truck driver who was outside the bank when the robber emerged. Newman testified that while sitting in his van, which was stopped in traffic, he saw a man wearing a ski mask and carrying a gun and a bank bag leave the bank. Newman told the jury that the man walked from the sidewalk into the street, stopped and removed the mask, and crossed in front of Newman's van before proceeding onto the Surface Artery. Newman testified that at that point he took his eyes off the robber in order to pull over and park the van. He then looked up the street and saw the man run northerly until he stopped next to a white car, which Newman later saw going down the street. At the conclusion of direct examination, Newman identified defendant as the man he saw leaving the bank.

On cross-examination defense counsel cast doubt on the eyewitness identification in several ways. Newman was asked whether he had graduated from college and responded he had not. Defendant then introduced a resume that Newman had submitted to a prospective employer which stated that he had a bachelor's degree from Boston University. After this attack on Newman's general credibility, defense counsel brought out that certain details of Newman's testimony at trial were inconsistent with what he had told the FBI eight months earlier. The most significant differences concerned how fast the robber was moving when Newman saw him, whether the robber was carrying a gun, and whether he drove away in a white car. Newman told the jury that the robber walked as he left the scene; he had told the FBI that the robber ran. Newman told the jury that the robber was carrying a gun; he had not told the FBI that he saw a gun. Finally, Newman testified that the robber stopped at a white car which Newman said he saw going down the street moments later; Newman had not mentioned seeing any car to the FBI.

We think that the demonstration of these basic inconsistencies in Newman's testimony clearly weakened the government's case. Defense counsel undermined it further by eliciting testimony from the defendant's girlfriend, who had testified for the government under a grant of immunity, that she was angry at defendant because he was seeing other women. In addition, defendant produced an alibi witness who testified that he was with her in Brockton, Massachusetts approximately twenty-five minutes after the robbery occurred. The government concedes that it would have been "well-nigh impossible" for the defendant to have travelled from Boston to Brockton in twenty-five minutes. From this evidence, we conclude that the government had a demonstrable need for the photographs to verify its identification witness's testimony.

The second question under *Fosher* is whether the photographs introduced at trial imply that the defendant had a prior criminal record. Unlike in *Fosher* where both frontal and profile shots of the defendant were shown to the jury, only front-view photographs were presented here, and each photograph had been closely cropped so that it showed only the person's head and upper shoulders. These cut-outs were mounted in two rows of three on a manila file folder; their photographic backdrops had been removed. There were no profile shots, no number markings, no height bars; in short, nothing to identify them as police mug shots as opposed to photos taken for a nonprejudicial identification purpose, such as a driver's license, a company i.d., or passport. Nor can we find the "trapped animal gaze" that defendant asserts is "the hallmark of mugshots." Appellant's Brief at 18. We find that the photographs, as introduced at trial, did not imply that the defendant had a prior criminal record.

Finally, we consider whether the manner of their introduction at trial drew particular attention to the source or implications of the photographs. We find that it did not. Despite the extremely high evidentiary value of a pretrial photographic identification, *Fosher*, 568 F.2d at 213, the government refrained from offering them during its case in chief. Instead it waited until the defendant had rested, then asked the court to view the evidence and rule on its admissibility out of the presence of the jury. Having obtained the court's permission, the prosecutor then called Newman and the trooper who had originally displayed the photographic array to him, and introduced the photographs into evidence through their testimony. Contrary to defendant's assertion that this amounted to a "spectacle," the government was careful to follow the instructions we gave in *Fosher*.

Having examined the record in light of the tripartite *Fosher* test, we hold that the district court did not abuse its discretion by admitting the photographic array.

### 4. *Judge's Selection of the Jury Foreperson*

■ Defendant's final argument is that the district court's selection of the jury foreperson constitutes reversible error. The trial judge appointed the foreperson at

the close of the evidence. Defendant objected, claiming that the man appointed had shown "distinct hostility" toward defense counsel during the course of the trial. The judge overruled the objection, specifically rejecting defendant's claim:

> Your objection is overruled and I don't think you have any basis of thinking that. I haven't seen any sign of hostility on his part.

Defendant cites no rule, statute, or case law forbidding the district judge from selecting the jury foreperson. Indeed, we take judicial notice that it is customary in the district courts of this circuit for the judge to do so. Because there is no valid reason to prohibit a trial judge from appointing the foreperson, and because we find no evidence in the record that the selection of this foreperson prejudiced defendant's case, we hold that the trial court did not abuse its discretion in selecting the jury foreperson.

*Affirmed.*