**Angel Luis PAGAN, Petitioner**

v.

**Thomas DICKHAUT, as he is Superintendent of the Souza Baranowski Correctional Center, Respondent.**

**Civil Action No. 06–11495–RCL.**

United States District Court, D. Massachusetts.

Sept. 29, 2008.

---

Angel Luis Pagan, Shirley, MA, pro se.

David M. Lieber, Assistant Attorney General, Randall E. Ravitz, Office of the Attorney General, Boston, MA, for Respondent.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

### I. INTRODUCTION

Angel Luis Pagan ("Pagan"), acting pro se, filed this petition for a writ of habeas corpus to challenge his detention pursuant to Section 2254 of Chapter 28 of the United States Code. Pagan is serving a life sentence at the Souza Baranowski Correctional Center in Shirley, Massachusetts, stemming from his convictions for first degree murder and armed home invasion. Pagan raises nine claims for relief in his habeas petition: prejudicial error from admission of prior bad acts; prejudicial error from admission of rebuttal evidence; violation of his Fourteenth Amendment rights because of those errors; error in not granting a new trial; ineffective assistance of counsel, both in failing to call a witness and in failing to object to admission of evidence and closing arguments; abuse of discretion by the trial judge; and failure to prove essential elements of each crime.

Respondent Thomas Dickhaut, the superintendent of the correctional facility,[1] opposes Pagan's petition and argues that no claims raised by Pagan warrant granting the petition. Respondent has also filed a motion to strike some of Pagan's claims and to dismiss the petition for failing first to exhaust state remedies.

---

1. Dickhaut replaced Lois Russo as the superintendent and is automatically substituted as the respondent.

## A. Procedural Posture

Pagan was indicted on January 4, 2001, on charges of murder and armed home invasion. (Respondent's Supplemental Answer [hereinafter "S.A."], § C at C.A. 3, Docket No. 8.) Counsel was appointed and filed several pretrial motions. (S.A. § C at C.A. 4.) Pagan was tried before a jury commencing on June 19, 2001. He was found guilty of both counts on June 22, 2001 and subsequently sentenced to life in prison. (S.A. § C at C.A. 5.)

Pagan appealed his conviction directly to the Massachusetts Supreme Judicial Court, which rejected all his claims on September 9, 2003. *Commonwealth v. Pagan*, 440 Mass. 84, 794 N.E.2d 1184 (2003). Pagan's subsequent motion for a new trial was denied without a hearing by the trial judge (S.A. § C at C.A. 6), and a single justice of the Supreme Judicial Court denied leave to appeal that denial on July 26, 2006 (S.A. § D).

Pagan promptly filed this habeas petition pro se on August 23, 2006. (Petition for Writ of Habeas Corpus [hereinafter "Pet."] Docket No. 1.) After several extensions, he filed a supporting memorandum on September 9, 2007. (Petitioner's Memorandum in Support of His Petition [hereinafter "Pet'r Mem."], Docket No. 18.) The Respondent filed his response and answer on October 17, 2006, and a memorandum supporting the response on December 7, 2007. (Respondent's Response/Answer, Docket No. 7; Respondent's Memorandum of Law in Opposition to Petition [hereinafter "Resp't Mem."], Docket No. 23.) The Respondent also filed a motion to strike and dismiss several of Pagan's claims on November 20, 2007 as well as a memorandum in support of that motion. (Respondent's Motion To Strike and Dismiss, Docket No. 20; Respondent's Memorandum of Law in Support of Motion to Strike [hereinafter "Resp't Mot. Mem."], Docket No. 21.)

## B. Relevant Factual Background[2]

### 1. Events Leading up to the Homicide

From 1990 to 1993 Pagan was involved in a relationship with Rosa Cruz ("Cruz"), but the relationship terminated shortly after Cruz became pregnant with Pagan's daughter. While Pagan maintained some contact with Cruz and was allowed to visit his daughter, his interactions with Cruz were at times confrontational. On June 5, 1993, Pagan came to Cruz's apartment with a gun tucked into his waistband, kicked in the door, and threatened to kill her if he saw her with another man. Cruz reported this incident to the police, and the officer who responded found the front door dented and the lock broken.

Sometime in early 1994, Cruz began seeing Angel Tolentino ("Tolentino"). Pagan subsequently found out about this relationship. On October 10, 1994, Pagan confronted Tolentino and Tolentino's brother in an alley. Tolentino said to Pagan, "we got to talk," to which Pagan replied, "we don't have to talk about anything," pointed a pistol at Tolentino and pulled the trigger. The gun jammed and Tolentino was able to run away.

A week later, on October 17, Pagan came to Cruz's apartment while Cruz was there with Tolentino. When Cruz refused to let him in, Pagan kicked in the door and

---

**2.** These facts, recited in a manner supportive of the verdict, are drawn from the Supreme Judicial Court's opinion, *Commonwealth v. Pagan*, 440 Mass. 84, 794 N.E.2d 1184 (2003), Pagan's trial transcripts (S.A. § C at C.A. 50– 256), and other materials provided by Pagan in the supplemental brief he prepared for his appeal to the Supreme Judicial Court (S.A. § G, Appendix).

came into the apartment. Upon seeing Cruz with Tolentino, Pagan slapped Cruz on the face and then left. Cruz reported this incident to the police.

## 2. The Homicide

Three days later, on October 20, Cruz was in her apartment with Tolentino and her two children. Also present were Cruz's friend Belinda Santos ("Santos"), Santos's boyfriend Steve Cartwright ("Cartwright"), and Cartwright's son. At about 8:30 in the evening, while Cruz was in the shower, Pagan and two other men unexpectedly entered the apartment. All three men were armed. Upon seeing them, Tolentino fled to the bedroom and locked himself in that room. Pagan and his companion drew their semiautomatic weapons and followed Tolentino down the hallway, while a third individual, believed to be Julio Correa ("Correa"), remained by the front door.

Pagan and his companion kicked in the door to the bedroom and fired at Tolentino, hitting him three times. The gunmen then left, with Pagan staring and smiling at Santos on his way out. Santos and Cartwright both identified Pagan as one of the two people who went after Tolentino, but neither person saw the actual shooting in the bedroom.[3]

Cruz came out of the shower after having heard gunshots and discovered Tolentino bleeding in the bedroom. At this point Santos told her that "Lito" (a nickname for Pagan) had shot "Chino" (a nickname for Tolentino). An ambulance took Tolentino away, and he later died from the gunshot injuries. A small folding knife was found in the bedroom by the police but it is unclear who possessed it.

Cartwright and Santos went to the police station, where they selected Pagan's photograph from an array and identified him as one of the assailants. Cruz, Santos, and Cartwright gave statements to the police about what happened that evening. Upon learning that there was a warrant out for his arrest, Pagan fled to New York and then Florida, where he was apprehended in 2000.

Correa was later arrested and charged with an unrelated drive-by shooting. He was interviewed by Special Agent Joseph Hobbs of the FBI and stated that he and two other individuals went to Cruz's apartment while armed and that shots were fired. He claimed, however, that he remained by the front door while the other two individuals chased and subsequently shot Tolentino.

## 3. Pagan's Trial

Pagan's trial in the Massachusetts Superior Court sitting in and for the County of Hampden commenced on June 19, 2001 and ended four days later, on June 22. Cruz, Santos, Cartwright and the police officers who took their statements all testified for the prosecution. Pagan and his mother testified in his defense. Pagan's defense proceeded on a theory of mistaken identity and his attorney claimed that Pagan was not the person who broke into Cruz's apartment.

The trial judge, Justice Daniel A. Ford, admitted in evidence testimony about Pagan's October 10th and 17th encounters with Cruz and Tolentino, ruling that they were probative of intent and motive. The judge, however, instructed the jury to limit their consideration of these prior bad acts to those purposes. Pagan testified on direct examination that he never kicked in

**3.** Cartwright grabbed his son and ran upstairs when he saw Pagan and his companion draw their guns.

the door to Cruz's apartment or had a motive to harm Tolentino. During his cross-examination, he testified that he did not have a gun. In rebuttal the prosecution recalled Cruz to testify about the June 5, 2003, incident when Pagan had kicked in her door, had a gun in his waistband, and threatened to kill her if she were to see other men.

At one point after Pagan's testimony, the trial judge, in discussing how to proceed with scheduling, commented to the jury that there may be other witnesses forthcoming.[4] The following day Pagan's mother did indeed testify.

There was a question as to whether the third gunman, Correa, would testify. Pagan wanted Correa to testify that both Santos and Cartwright, the prosecution's witnesses, were downstairs and could not have seen Pagan shoot Tolentino. Pagan's counsel strenuously disagreed with the usefulness of Correa's testimony because it would place Pagan in Cruz's apartment and undermine Pagan's theory of mistaken identity. Correa ultimately did not testify.

When Santos testified at the trial, she had trouble identifying Pagan because of the amount of time that had elapsed between the shooting and the trial. A photocopy of a "mug shot" style photograph of Pagan was introduced into evidence to help her with the identification, as it showed Pagan with longer hair, similar to his appearance at the time of the homicide. The photograph had been "sanitized," with incriminating features such as height marks and police identifiers removed. The judge instructed the jury not to speculate as to the origin or nature of the photograph.

In their closing arguments, the prosecution recited elements of the crimes for which Pagan was charged. The trial judge then instructed the jury on the law, the burden of proof, the proper use of evidence and the required elements of the crimes. The jury found Pagan guilty of armed home invasion and of first degree murder, premised on two theories of culpability: deliberate premeditation and felony-murder.

### 4. Subsequent Appeal and Motion for a New Trial

Because Pagan was convicted of a capital offense, he appealed the conviction directly to the Massachusetts Supreme Judicial Court. His appeal claimed that the admission in evidence of his prior bad acts and the rebuttal testimony denied him Due Process under the Fourteenth Amendment as well as under the Massachusetts Constitution. Pagan supplemented his counsel's brief with his own pro se brief, in which he raised additional claims of ineffective assistance of counsel for failing to call a material witness, object, investigate, and file motions. Pagan also claimed that the judge erroneously gave a missing witness instruction and that there was insufficient evidence for the armed home invasion and murder convictions. The Supreme Judicial Court affirmed Pagan's conviction on September 9, 2003, rejecting all nine claims raised in both the brief submitted by Pagan's counsel and Pagan's pro se supplement. *Commonwealth v. Pagan*, 440 Mass. 84, 794 N.E.2d 1184 (2003).

Pagan subsequently moved the Superior Court for a new trial. He argued that the judge abused his discretion in failing to instruct the jury that the prosecutor's recitation of the law during closing arguments

---

4. Because the part of the Trial transcript containing the trial judge's comment is not in the record, the comment is taken from Petition-er's Brief to the Massachusetts Supreme Judicial Court. (S.A. § G at 11.)

was not controlling. He also claimed that the mug shot photograph should not have been introduced in evidence unless the front and profile views were severed. Pagan additionally claimed that his counsel was ineffective in failing to object to those issues, and that his appellate counsel was also ineffective. His motion was denied by the trial judge on August 11, 2004, and Pagan promptly petitioned for leave to appeal this denial. Pursuant to Massachusetts law, the petition for leave was considered by a single justice of the Supreme Judicial Court, and Justice Cowin denied Pagan's petition on July 26, 2006. (S.A. § D.)

## C. Federal Jurisdiction

This Court has jurisdiction over this petition pursuant to 28 U.S.C. § 2254.

## II. ANALYSIS

### A. The Applicable Legal Standard

#### 1. The AEDPA Standard for Habeas Review

Under AEDPA, a petition for a writ of habeas corpus shall not be granted for any claims that were adjudicated on the merits in state court unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Yarborough v. Alvarado,* 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).

For a state court decision to be contrary to clearly established law, it must "appl[y] a rule that contradicts the governing law set forth in [Supreme Court] cases" or "confront[ ] a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrive[ ] at a result different from [Supreme Court]

precedent." *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Federal courts may also grant the petition under the "unreasonable application" clause, if the state court correctly identifies the governing legal principles but "unreasonably applies those principles to the facts of the particular ... case". *Id.* at 407, 120 S.Ct. 1495. In deference to state courts, application of the law must be not merely incorrect but "objectively unreasonable". *See id.* at 409, 120 S.Ct. 1495.

#### 2. Exhaustion Requirement

State prisoners are required to exhaust their available state remedies before petitioning the Federal courts for habeas relief. 28 U.S.C. § 2254(b)-(c) (2006); *see also Rose v. Lundy,* 455 U.S. 509, 518, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). A "mixed petition"—one containing both exhausted and unexhausted claims—must be dismissed by the district courts. *Lundy,* 455 U.S. at 522, 102 S.Ct. 1198. As will be discussed *infra,* there are several ways for the district courts to deal with mixed petitions in light of the one-year statute of limitations for habeas petitions enacted in AEDPA.

To have exhausted a claim, petitioners must first give the state an "opportunity to pass upon and correct" alleged violations of their federal rights. *Baldwin v. Reese,* 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004). In order to give the state such an opportunity, prisoners must "fairly present" their claims to the state courts thereby alerting the state courts to the federal nature of their claims. *Id.* Petitioners can easily indicate the federal nature of their claim by citing federal law, or even simply labeling the claim "federal". *Id.* at 32. The First Circuit has catalogued several ways by which claims may be fairly presented, including:

1) citing a specific provision of the Constitution; 2) presenting the substance of a federal constitutional claim in such manner that it likely alerted the state court to the claim's federal nature; 3) reliance on federal constitutional precedents; ... 4) claiming a particular right specifically guaranteed by the Constitution[; and 5)] the assertion of a state law claim that is functionally identical to a federal claim.

*Scarpa v. DuBois*, 38 F.3d 1, 6 (1st Cir. 1994). If, however, the court must read beyond a petition or a brief in order to find material that alerts it to the presence of a federal claim, such a claim cannot be said to have been fairly presented to the state court. *Reese*, 541 U.S. at 32, 124 S.Ct. 1347.

### B. Grounds Raised by the Petitioner[5]

#### 1. Admission of Prior Bad Acts (Grounds I, III)

Pagan argues that admission in evidence of the acts on October 10 and October 17 was prejudicial and, because such prejudice outweighed the probative value of the acts, admission of this evidence violated the Due Process Clause of the Fourteenth Amendment. (Pet. # 12 §§ I, III; Pet'r Mem. § III(A), (C).) The Respondent submits that the introduction of such evidence was not contrary to federal law, and, even if it was, such an error was harmless. (Resp't Mem. § II(B).)

Respondent's invocation of federal law is a bit wide of the mark because the relevant law—the Federal Rules of Evidence—are inapplicable in state courts. Still, one can properly reason by analogy that Pagan has been accorded due process

of the law if the Superior Court's evidentiary rulings would pass muster under the cognate provisions of the Federal Rules of Evidence.

■ The Federal Rules of Evidence bar the introduction of prior bad acts as evidence of criminal character or propensity to commit crimes. *See* Fed.R.Evid. 404(b). The Supreme Court has held, however, that evidence of prior bad acts, when introduced for another relevant purpose, is allowed under the Federal Rules of Evidence because such "evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct". *Huddleston v. United States*, 485 U.S. 681, 685, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988); *see also Estelle v. McGuire*, 502 U.S. 62, 69, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (concluding that prejudicial evidence of victim's prior injuries was probative of intent with which person who caused injuries acted, and therefore admissible, even without direct link to defendant).

Thus in *Huddleston*, the defendant was charged with selling stolen videotapes and the only issue was whether he knew that the tapes were stolen. 485 U.S. at 683, 108 S.Ct. 1496. The Supreme Court allowed testimony about the defendant's prior attempt to sell stolen appliances because such evidence was necessary to show that the defendant had knowledge that he was selling stolen goods. *Id.* at 684, 108 S.Ct. 1496. The Court acknowledged that there were concerns about undue prejudice, but held that such concerns are mini-

---

5. Because Pagan is proceeding pro se, he is held to a "less stringent standard[ ] than formal pleadings drafted by lawyers" and his petition is interpreted liberally. *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *see also Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (holding that petitioner's handwritten pro se document is to be liberally construed).

mized by ensuring that the evidence is admitted for a proper purpose, is relevant, and its probative value is not outweighed by its prejudicial value. *Id.* at 691, 108 S.Ct. 1496.

Similarly the Supreme Court has allowed introduction of testimony about a robbery, for which the defendant was acquitted, for the limited purpose of showing that the defendant had used a similar gun and also knew another individual involved in the robbery. *Dowling v. United States,* 493 U.S. 342, 345, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). The Court held that such evidence did not violate the defendant's right to Due Process, because the jury remained free to evaluate the truthfulness and the significance of the evidence and the judge's limiting instructions served to minimize misuse of such evidence. *Id.* at 353, 110 S.Ct. 668.

In contrast, when evidence of a prior bad act is not necessary for other purposes and is highly prejudicial, such evidence might not be admitted, as it may allow a jury to draw negative inferences about the defendant's propensity to commit crimes. *See* Fed.R.Evid. 403; *United States v. Varoudakis,* 233 F.3d 113, 120, 121 (1st Cir.2000). In *Varoudakis,* the defendant was charged with arson and conspiracy for paying someone to set his unprofitable restaurant on fire. *Id.* at 117. The First Circuit concluded that admission of testimony about a prior car fire started by the defendant was probative of the relationship between him and a co-conspirator because it showed "[the defendant] trusted [the co-conspirator] so much that he was willing to commit a crime in her presence". *Id.* at 121. The court held, however, that because the nature of the relationship could have been established by other, less prejudicial evidence, the probative value of the car fire was substantially outweighed by the danger of unfair prejudice and

therefore the trial court's admission of such evidence was erroneous. *See id.* at 124.

Because Pagan's prior bad acts were not used merely as character evidence but were instead introduced to show that Pagan knew Tolentino, knew of Tolentino's relationship with Cruz, and had a motive to kill Tolentino, admission of such evidence by the trial judge was in no way violative of Pagan's right to due process of law. *See Dowling,* 493 U.S. at 353, 110 S.Ct. 668; *Huddleston,* 485 U.S. at 691, 108 S.Ct. 1496. Inclusion of Pagan's prior bad acts is similar to the prior bad act testimony in *Dowling* because it was the only way to establish that the defendant knew the victim. *See Dowling,* 493 U.S. at 353, 110 S.Ct. 668; *see also Huddleston,* 485 U.S. at 691–92, 108 S.Ct. 1496. The evidence was introduced to show Pagan's hostile attitude towards Tolentino and Pagan's disapproval of the relationship between Tolentino and Cruz. *Pagan,* 440 Mass. at 88, 794 N.E.2d 1184. The trial judge further instructed the jury to "consider the evidence solely on the issues of [Pagan's] motive or intent" and not as evidence of bad character. *Id.* As in *Dowling,* the evidence was offered for a proper purpose, Pagan had the opportunity to refute the testimony of the events, the judge issued limiting instructions, and the jury chose how much weight to attach to such evidence. *See Dowling,* 493 U.S. at 352–53, 110 S.Ct. 668.

The highly probative value of Pagan's prior bad acts was not substantially outweighed by the danger of unfair prejudice and no other evidence was available to the prosecution to show the issues it sought to establish. *See Dowling,* 493 U.S. at 352–53, 110 S.Ct. 668; *see also United States v. Griffin,* 818 F.2d 97, 101–02 (1st Cir.1987) (holding that district court's informed discretion in weighting probative value and

prejudicial effect will be reversed only in exceptional circumstances). The prosecution did not have less prejudicial means to establish that Pagan knew the victim, or disapproved of the relationship between the victim and Cruz. *See Pagan,* 440 Mass. at 84, 794 N.E.2d 1184. Thus, unlike *Varoudakis,* the prosecution's introduction of Pagan's prior bad acts did not create undue prejudice toward the defendant. *See Huddleston,* 485 U.S. at 687–88, 108 S.Ct. 1496.

### 2. Rebuttal Evidence (Grounds II, III)

Pagan claims that the rebuttal testimony of Cruz was improperly admitted and that prejudice stemming from this testimony denied him a fair trial. (Pet. # 12, §§ II, III; Pet'r Mem. § III(B),(C).) The Respondent does not address the specific issue of the rebuttal evidence, addressing instead the inclusion of prior bad acts as a whole. (Resp't Mem. § II(B).)

■ When a defendant "opens the door" to impeachment through his statements on direct examination, the prosecution may try to establish that his testimony is not to be believed through cross-examination and the introduction of evidence that contradicts the direct testimony. *United States v. Morla–Trinidad,* 100 F.3d 1, 5 (1st Cir. 1996). The Supreme Court has further held that when defendants testify, they must do so truthfully or "suffer the consequences." *United States v. Havens,* 446 U.S. 620, 626, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). The *Havens* Court held that

> In terms of impeaching a defendant's seemingly false statements with ... other reliable evidence available to the government, we see no difference of constitutional magnitude between the

defendant's statements on direct examination and his answers to questions put to him on cross-examination that are plainly within the scope of the defendant's direct examination.

*Id.* at 627, 100 S.Ct. 1912; *see also Morla–Trinidad,* 100 F.3d at 6; *United States v. Wood,* 982 F.2d 1, 4 (1st Cir.1992) (concluding that decisions whether to permit introduction of rebuttal evidence reside within sound discretion of trial judge).

■ Pagan testified on direct examination that he never kicked in the door to Cruz's apartment (S.A. § C at C.A. 116), and that he never had a motive to hurt Tolentino (S.A. § C at C.A. 131). Pagan further testified during his cross-examination that he did not have a gun in 1994. (S.A. § F at 30.)[6] Cruz's rebuttal testimony directly addressed those claims, stating that he had previously kicked in her door, had been armed, and had threatened to kill Cruz if she "went with another man". (S.A. § F at 32.) The admission of Cruz's rebuttal testimony was appropriate because it directly contradicted and impeached Pagan's statements that were relevant to his motive for shooting Tolentino, and therefore the trial judge did not abuse his discretion in admitting such rebuttal testimony. *See Morla–Trinidad,* 100 F.3d at 6; *Wood,* 982 F.2d at 4.

### 3. Failure by the Supreme Judicial Court to Order a New Trial (Ground IV)

The petitioner claims that because the inclusion of prejudicial evidence about his prior bad acts permeated his trial, the Massachusetts Supreme Judicial Court should have exercised its power under Section 33E of chapter 278 of the Massachusetts general laws to order a new trial (Pet. IV; Pet'r Mem. § III(D).) The Re-

---

**6.** Because the record does not contain the full trial transcript, segments are taken from Pa-

gan's appellate brief to the Supreme Judicial Court (S.A. § F).

spondent moves to strike this ground as unexhausted because it did not present an issue of federal law to the state court. (Resp't Mot. Mem. at 13.) The Respondent further contends that, even if the ground was exhausted, the Supreme Judicial Court's failure to order a new trial was not in contravention of federal law. (Resp't Mem. § II(C).)

The Supreme Judicial Court has substantial discretion under Section 33E to grant relief, and "may, if satisfied that the verdict was against the law or the weight of the evidence ... order a new trial". Mass. Gen. Laws ch. 278 § 33E; *see also Leftwich v. Maloney*, 532 F.3d 20, 24 (1st Cir.2008). Here, the Supreme Judicial Court reviewed the entire record as required by Section 33E and concluded that there were no grounds raised by Pagan or his counsel that would justify ordering a new trial. *Pagan*, 440 Mass. at 93, 794 N.E.2d 1184.

While Pagan's argument on this ground to the Supreme Judicial Court did not mention any issues of federal law and thus might be considered unexhausted, *see Reese*, 541 U.S. at 32, 124 S.Ct. 1347, a broad reading of the petition suggests that this ground may be coupled with Pagan's constitutional due process grounds stemming from the admission of trial of prior bad acts. Insofar as this ground differs from the prior bad act and rebuttal evidence grounds for relief, Pagan has not shown that the Supreme Judicial Court's exercise of discretionary review contradicted governing federal law or differed from Supreme Court precedent and therefore this ground cannot form a basis for granting his habeas petition. *See generally Lisenba v. California*, 314 U.S. 219, 227–28, 62 S.Ct. 280, 86 L.Ed. 166 (1941) (ruling that Fourteenth Amendment leaves states free to adopt rules of relevance and up-

holding admission of similar but disconnected acts to establish intent and design).

### 4. "Missing Witness" Instruction (Ground VI)

■ Pagan alleges that the trial judge abused his discretion in giving a missing witness instruction to the jury. (Pet. # 12, § VI; Pet'r Mem. § III(F) incorporating S.A. § G at 10–14.) The Respondent contends that this claim is groundless because the instruction did not offend federal law (Resp't Mem. § II(D)).

■ A missing witness instruction tells the jury that, when it is within a party's power to produce a witness, the failure to call such a witness may justify an inference against that party. *United States v. Anderson*, 452 F.3d 66, 74 (1st Cir.2006). Other types of negative inferences from promised testimony may also prejudice a defendant. *See, e.g., Ouber v. Guarino*, 293 F.3d 19, 35–36 (1st Cir.2002) (affirming habeas grant because defendant was prejudiced by her attorney's repeated promises to jury that she would testify and subsequent failure to have her testify).

Pagan erroneously characterizes the trial judge's comment to the jury about postponing testimony until the following day (S.A. § G at 11 (quoting Trial Vol. III, 157)) as a "missing witness" instruction. The trial judge did not say which party was planning to call witnesses, only that there may be more witnesses forthcoming, and Pagan's mother testified the following day. (S.A. § C at C.A. 134.) The Supreme Judicial Court ruled that the judge's scheduling remark could not have prejudiced Pagan or been a missing witness instruction. *Pagan*, 440 Mass. at 91–92, 794 N.E.2d 1184. Pagan does not cite any cases that would suggest that the court's ruling was contrary to, or an unreasonable application of federal law, and

therefore this ground cannot give rise to a grant of his habeas petition.

### 5. Failure to Prove Essential Elements of Armed Home Invasion and Murder (Grounds VII, VIII)

Pagan claims that the prosecution failed to prove essential elements of armed home invasion and first degree murder. (Pet. # 12, §§ VII, VIII.) In Pagan's supplement to the Supreme Judicial Court appeal,(S.A. § G.), he contends that his conviction for first degree murder violated the Due Process clause of the Fourteenth Amendment because the prosecution did not prove that it was he who fired the fatal shot or, alternatively, that he shot Tolentino in self-defense after Tolentino brandished a knife. (S.A. § G, 21, 25, 27–28.) [7] The Respondent claims that these grounds should be stricken because Pagan failed to argue their merits in his memorandum. (Resp't Mot. Mem. § II(A).)

Pagan makes a subsequent claim in his memorandum that the jury instructions were erroneous and may have confused the jury as to the different theories of murder. (Pet'r Mem. § III(M).) The Respondent submits that this sub-ground should be stricken because it is not raised in the petition. (Resp't Mot. Mem. at 16.)

The Respondent further addresses the judge's instructions on the murder charge and submits that because the instructions were accurate, Pagan is not entitled to habeas relief. (Resp't Mem. § II(G).)

In criminal cases the evidence is legally sufficient "[i]f the evidence presented, taken in the light most flattering to the prosecution, together with all reasonable inferences favorable to it, permits a rational jury to find each essential element of the crime charged beyond a reasonable doubt...." *Leftwich,* 532 F.3d at 23 (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Habeas review, however, requires the layering of that standard with the AEDPA standard—whether the state court decision is objectively unreasonable. *Hurtado v. Tucker,* 245 F.3d 7, 16 (1st Cir.2001).

#### a) Armed Home Invasion

Pagan cites no federal law to support his claim that the prosecution failed to prove essential elements of armed home invasion. Under Massachusetts law, armed home invasion consists of four elements: knowingly entering the dwelling of another; knowing, or having reason to know, that others are present within the dwelling; while armed with a dangerous weapon; and using force or threatening the imminent use of force, whether or not injury occurs. *See* Mass. Gen. Laws ch. 265, § 18C (2008); *see also Mahar v. Hall,* No. 01–10354–GAO, 2008 WL 2704563, at *1 (D.Mass. 2008) (O'Toole, J.) (listing elements).

The Supreme Judicial Court held that the evidence established that Pagan, "while armed and knowing that people were present in Cruz's apartment, inten-

---

**7.** Pagan also claims that imposition of consecutive sentences for murder and home invasion is duplicative but fails to advance any legal or factual basis to support this claim. (Pet. # 13 § II.) The Supreme Judicial Court found that armed home invasion did not merge into felony murder because Pagan was found guilty of murder on the basis of deliberate premeditation. *See Pagan,* 440 Mass. at 92, 794 N.E.2d 1184. This cannot be the basis for habeas relief because a state court's interpretation of state law "binds a federal court sitting in habeas corpus". *Bradshaw v. Richey,* 546 U.S. 74, 76, 78, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005) (upholding Ohio's interpretation of Ohio law regarding felony murder). Insofar as Pagan argues that consecutive sentences are contrary to federal law, his argument is also without merit. *See, e.g., Witte v. United States,* 515 U.S. 389, 405, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995) (discussing sentencing guidelines).

tionally entered the apartment and shot Tolentino". *Pagan*, 440 Mass. at 93, 794 N.E.2d 1184. Because the Supreme Judicial Court found that Pagan's crime met the required elements of armed home invasion, it cannot be said that affirming Pagan's conviction was contrary to, or an unreasonable application of federal law. *See Hallums v. Russo*, 491 F.Supp.2d 161, 170 (D.Mass.2007) (denying habeas where it is clear that elements of armed home invasion were met) aff'd without opinion (1st Cir., Judgment, June 6, 2008).

### b) Murder

The Supreme Judicial Court held that the evidence was sufficient to convict Pagan on the theory of joint venture. *Pagan*, 440 Mass. at 92 n. 7, 794 N.E.2d 1184. The court further held that, being the instigator of the confrontation, Pagan could not claim self-defense even if Tolentino did have a knife. *Id.* at 91, 794 N.E.2d 1184. Because the Massachusetts court adopted the governing federal constitutional standard as its standard for evaluating the sufficiency of the evidence, the theory of joint venture is not contrary to federal law. *See Leftwich*, 532 F.3d at 24 (examining Supreme Judicial Court's joint venture rulings). Pagan does not cite any cases that would support his contention that rejecting the self-defense argument was contrary to, or an unreasonable application of, federal law. *But see, e.g., Epsom v. Hall*, 330 F.3d 49, 54 (1st Cir.2003) (recognizing Massachusetts requirement to retreat before using deadly force); *United States v. Slocum*, 486 F.Supp.2d 1104, 1109 (C.D.Cal.2007) (refusing to recognize exception to self-defense doctrine when invoked by those who initiate confrontations).

### c) Jury Confusion

Pagan argues that jury instructions defining second degree murder were the same as those given for first degree murder. Massachusetts law lets the jury determine the degree of the murder and "murder which does not appear to be in the first degree is murder in the second degree". Mass. Gen. Laws ch. 265 § 1 (2008). Pagan fails to point to any federal law that contradicts the jury instructions based on the Massachusetts statute.[8]

### 6. Trial Judge's Jury Instructions on Controlling Law

Pagan argues in his supporting memorandum that the trial judge abused his discretion by not properly instructing the jury that the prosecution's rendition of applicable legal principles was not the controlling law. (Pet'r Mem. § III(H).) Pagan first presented this claim in his motion for a new trial (S.A. § C at C.A. 15). The Respondent submits that Pagan is not entitled to habeas relief on this ground because the summary of the law was accurate and did not offend federal law. (Resp't Mem. § II(E).)

■ A non-prejudicial description of the law by the prosecution is not considered erroneous when it is accompanied by the description of law from the trial judge along with instructions that the judge's description is to be the controlling one. *See United States v. Tapia*, 738 F.2d 18, 21 (1st Cir.1984); *see also United States v. Sinskey*, 119 F.3d 712, 719 (8th Cir.1997) (concluding that jury instructions sufficiently cured any unfair prejudice that may have resulted from prosecutor's incorrect rendition of law); *United States v.*

---

**8.** Insofar as Pagan's claim makes the argument that the felony murder doctrine impermissibly shifts the burden of proof on the

element of malice, that claim is without merit. *See supra*, note 7.

*Mejia–Lozano,* 829 F.2d 268, 273 (1st Cir. 1987) (holding that reversal is not warranted when district judge told jury on at least three occasions that they were to take the law from the court).

Pagan presented this claim to the state court in his motion for leave to appeal the denial of a new trial; therefore, this claim may be considered exhausted. (S.A. § C at C.A. 15.) Judge Ford told the jury that he will "instruct [them] in the law that [they] must apply to the facts" and his first instruction was that the jury "must accept the entire body of law that [he was] going to give to [them]". (S.A. § C at C.A. 217.) Pagan fails to cite any federal cases that show that the trial judge's instructions were contrary to, or an unreasonable application of, established federal law. *See Tapia,* 738 F.2d at 21.

### 7. Introduction of Unsevered Mug Shot

Pagan claims that the introduction of his police mug shot, showing both the frontal and profile poses, was error because it created the inference that he had a prior criminal record. (Pet'r Mem. § III(J), incorporating S.A. § C at C.A. 20–23.) The Respondent argues that this claim cannot be a basis for habeas relief. (Resp't Mem. § II(F).)

■ Because of the prejudice inherent in a mug shot-style photograph, the First Circuit, without adopting a per se rule, concluded that normally there must exist three prerequisites for the admission of such photographs in evidence. The First Circuit has held that:

1) [t]he Government must have a demonstrable need to introduce the photographs; and 2)[t]he photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and 3)[t]he manner of introduction at trial must be such that it

does not draw particular attention to the source or implications of the photographs.

*United States v. Cannon,* 903 F.2d 849, 855 (1st Cir.1990) (citing *United States v. Fosher,* 568 F.2d 207, 214 (1st Cir.1978)).

The *Fosher* court overturned a defendant's conviction because his unaltered mug shot photograph implied that he had engaged in prior criminal conduct. *Fosher,* 568 F.2d at 217. In contrast, the *Cannon* court upheld the use of such photographs where only the front-view was presented and each photograph had been closely cropped so that it showed only the person's head and upper shoulders. *Cannon,* 903 F.2d at 856. The court reasoned that because all the tell-tale features of a mug shot—for instance profile shots, number markings, or height bars—had been removed, there was nothing these photographs as mug shots and therefore no implication of prior criminal conduct. *See id.*

Under AEDPA, however, in this area, clearly established federal law is limited to the decisional law "determined by the Supreme Court of the United States." 28 U.S.C. 2254(d)(1). The Supreme Court has neither adopted nor rejected the First Circuit's admissibility test; and, furthermore, the habeas standard of review is extremely deferential to state court decisions, suggesting that "admission of mugshots into evidence requires reversal on federal habeas review only when the prejudicial value of the photos greatly outweighs their probative value." *Sheffield v. Curran,* 645 F.Supp. 859, 861 (D.Mass. 1986) (Tauro, J.) (internal quotations omitted). In reviewing a habeas petition, Judge Tauro found that admission of "unsanitized" mug shot—one with identifying features such as height bars intact—was not in violation of federal law and was

extremely probative because the key issue in the case was the identity of the defendant. *Sheffield,* 645 F.Supp. at 861.

■ Because Pagan cited federal law in his petition for leave to appeal, this ground can be considered exhausted. It can be argued that Pagan's mug shot satisfied, albeit barely, the First Circuit's three part admissibility test. *See Cannon,* 903 F.2d at 856. As in *Cannon,* the photograph was necessary to the prosecution, because Pagan's appearance had changed in the six years between the shooting and his capture. *See id.* The photograph was sanitized before being presented to the jury (S.A. § C at C.A. 70) and the judge instructed the jury that they could not speculate as to the origin of the photograph. (S.A. § C at C.A. 244.) While the photograph's front and profile shots were not severed,[9] the trial judge reasoned that such severance would deprive the jury of a clear depiction of Pagan's hair length—exactly the issue that gave Santos trouble. (S.A. § C at C.A. 62; S.A. § D at 2, 4.) Pagan has not shown that trial judge's admission of such a photograph contravened the clearly established decisional law of the Supreme Court, and the state court's rejection of his claim cannot be said to be objectively unreasonable such that habeas relief could be granted on this ground. *See Cannon,* 903 F.2d at 856; *Sheffield,* 645 F.Supp. at 861.

### 8. Ineffective Assistance of Counsel (Grounds V, IX)

Pagan argues that his counsel was ineffective because he failed to do the following: call potential witness Correa[10]; object to admission of prior bad acts and rebuttal evidence; file motions in limine; develop a theory to support the defense; object to the prosecutor's rendition of law in closing arguments; and prevent admission of Pagan's unsevered mug shot in evidence. (Pet. # 12, § V, IX; Pet'r Mem. §§ III(E), (G), (I), (K).) The Respondent opposes these claims, arguing that Pagan has not met the demanding standard to demonstrate ineffective assistance of counsel. (Resp't Mem. § II(E), (H).) Pagan also contends that his appellate counsel was ineffective for failing to raise some of the abovementioned claims on appeal. (Pet'r Mem. § III(L), incorporating C.A. 25–27.) The Respondent argues that this claim has not been exhausted and should therefore be stricken from Pagan's memorandum. (Resp't Mot. Mem. at 15.) The Respondent further argues that even if the claim has been exhausted, Pagan's counsel was not constitutionally ineffective and

9. This is the most problematic aspect of this decision and constitutes the point upon which a certificate of appealability is almost sure to issue. Given First Circuit decisional law, I consider that the failure to sever the front and profile shots constitutes error of constitutional magnitude. Yet, because AEDPA requires me to focus only on Supreme Court decisional law—and that court has not spoken to the issue—I have no choice but to defer the judgment of my state colleagues. The effect of AEDPA is thus to freeze the development of constitutional criminal procedure in the state courts to the pace at which the Supreme Court desires to proceed. Many federal judges consider such a freeze an unconstitutional erosion of the judicial power conferred upon them in Article III of the United States Constitution. *See Evans v. Thompson,* 524 F.3d 1, 1–5 (1st Cir.2008) (Lipez, J. dissenting) and cases cited. *See also United States v. Luisi,* 2008 WL 2854498 at *11 (D.Mass. July 25, 2008).

10. Pagan also raises this claim as a "right to confront witnesses". (Pet. # 13 § I.) In addition to the fact that this claim has not been exhausted at the state level, Pagan's argument that he had a right to confront Correa is without merit because no statements by Correa were used at trial. *See generally California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (examining history of the Confrontation Clause).

therefore his petition ought not be granted on this ground. (Resp't Mem. § II(H).)

A defendant asserting ineffective assistance of counsel must overcome the strong presumption that counsel rendered adequate assistance during trial and must show both that counsel's performance was deficient and that such deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Judicial scrutiny of counsel's performance must be highly deferential, and counsel's strategic choices are considered reasonable to the extent that they were based on reasonable investigation by the attorney. *Id.* at 689, 690–91, 104 S.Ct. 2052. Additionally the defendant must also demonstrate that deficiencies in counsel's performance prejudiced the defense. *Id.* at 691–92, 104 S.Ct. 2052. The appropriate test for prejudice is a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different". *Id.* at 694, 104 S.Ct. 2052.

Because the performance of Pagan's counsel was reasonable under the circumstances and such performance did not prejudice the defense, the writ of habeas corpus cannot be granted on this ground. *See Strickland,* 466 U.S. at 698–99, 104 S.Ct. 2052. None of Pagan's claims demonstrate that his counsel's actions were anything other than strategic choices and those choices were reasonable given the circumstances. *See id.* Pagan further fails to show that his counsel's performance prejudiced Pagan's defense and thereby was in violation of his constitutional rights. *See id.*

### a) Decision to Not Call Correa as a Witness

■ Pagan's petition fails to overcome the presumption of adequate performance

because trial counsel's failure to call witnesses who would undermine the defense theory of the case does not fall below the standard of reasonable representation. *See Strickland,* 466 U.S. at 688, 699, 104 S.Ct. 2052; *United States v. Hart,* 933 F.2d 80, 83 (1st Cir.1991). Pagan's attorney chose not to call Correa because the attorney thought Correa might have testified to the fact that Pagan was one of the people to enter Cruz's apartment. (S.A. § G, Impounded Attorney's Conference, Appendix A, 2, 3.) The decision not to call Correa was reasonable in light of the fact that Correa's testimony would undermine Pagan's mistaken-identity defense. *See Pagan,* 440 Mass. at 91 n. 6, 794 N.E.2d 1184; (S.A. § G, Appendix A, 13, 25.)

Failure to call a witness who would have undermined Pagan's theory of mistaken identity and placed Pagan at the scene of the homicide did not undermine confidence in the outcome of Pagan's trial and therefore could not be considered ineffective assistance. *See Knight v. Spencer,* 447 F.3d 6, 16–17 (1st Cir.2006) (holding that failure to call alibi witness open to significant impeachment after six alibi witnesses have already been called was a tactical decision). It is reasonable to conclude that the testimony of Correa, under investigation by the FBI in connection with at least two shootings, would not undermine the testimony of Cruz, Santos, and Cartwright. *See id.; see also Phoenix v. Matesanz,* 233 F.3d 77, 84 (1st Cir.2000) (holding that failure to call expert who could not testify as to whether fingerprint belonged to defendant did not constitute ineffective assistance).

### b) Failure to Object to Introduction of Prior Bad Acts, Investigate a Material Witness, File Motion in Limine, or Develop a Theory of Defense

■ Pagan argues that his counsel was ineffective because he failed to object to

the introduction of prior bad acts, to investigate Correa, to file a motion in limine, and to develop a theory of defense. (S.A. § G 33–38.) Failure to raise futile or meritless legal arguments falls well within the range of reasonable assistance and thus cannot constitute ineffective assistance of counsel. *See Hart,* 933 F.2d at 83; *Acha v. United States,* 910 F.2d 28, 32 (1st Cir. 1990); *see also Phoenix,* 233 F.3d at 84 (holding that defense counsel may make strategic decisions, within wide bounds of professional competence, with respect to the areas upon which to focus his energies, especially during trial when time is short). The failure of Pagan's counsel to object to the introduction of the prior bad acts was not unreasonable because such objections would have been overruled. *See Pagan,* 440 Mass. at 87, 88, 794 N.E.2d 1184. Counsel did, however, raise meritorious objections, made sure the mug shot photograph was properly "sanitized" (S.A. § C at C.A. 69), filed pretrial motions (S.A. § C at C.A. 33), and presented the mistaken identity theory (S.A. § C at C.A. 156–85). Counsel's decision not to present Pagan's self-defense claim was reasonable because this, like Correa's testimony, would have placed Pagan at the scene of the homicide and the self-defense argument would not be available to Pagan because he was the instigator of the confrontation. *See supra* Part II.B.5.b. As such, counsel's defense was a result of reasonable and professional, albeit ultimately unsuccessful, judgment. *See Strickland,* 466 U.S. at 700, 104 S.Ct. 2052.

Furthermore, since objections to admission of prior bad acts would not have been granted, failure to raise them did not render counsel ineffective. *See Strickland,* 466 U.S. at 699–700, 104 S.Ct. 2052; *United States v. Fisher,* 3 F.3d 456, 463 (1st Cir.1993). Such futile objections do not undermine confidence in the outcome of Pagan's trial and therefore did not prejudice his defense. *See Fisher,* 3 F.3d at 459, 463; *see also Straw v. United States,* 931 F.Supp. 49, 52 (D.Mass.1996) (Gorton, J.) (holding that no prejudice resulted where downward departure in sentencing would not have been granted, even if petitioner's argument had been made). Therefore, Pagan's conviction was not the result of the ineffective assistance of counsel. *See Strickland,* 466 U.S. at 701, 104 S.Ct. 2052.

### c) Failure to Object to Unsevered Mug Shot and Prosecution's Closing Statements

Insofar as objections to the introduction of the mug shot or the prosecution's recitation of law in their closing argument would not have been granted (see supra), failure of counsel to raise such objections did not render his performance inadequate or prejudice Pagan's defense. *See Fisher,* 3 F.3d at 463; *Acha,* 910 F.2d at 32.

### d) Failure to Raise Some Claims on Appeal

The Supreme Court has held that the *Strickland* standard applies to ineffective assistance of appellate counsel claims as well as the assistance of trial counsel. *Smith v. Robbins,* 528 U.S. 259, 286–89, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). To meet this standard, a defendant must demonstrate both that appellate counsel's performance was inadequate and that such performance caused prejudice to the defendant. *Id.* at 289, 120 S.Ct. 746.

Appellate counsel is not required to raise every non-frivolous claim and counsel who selects the best claims to maximize the likelihood of their success on the merits is not considered ineffective. *Lattimore v. Dubois,* 311 F.3d 46, 57 (1st Cir. 2002). In *Lattimore,* the court held that, given the absence of record support for a

**360**

particular ground, victory on appeal was unlikely, and therefore petitioner failed to meet both the performance and prejudice prongs of the test. *See Lattimore,* 311 F.3d at 57–58; *see also Palmer v. United States,* 46 Fed.Appx. 5, 10 (1st Cir.2002) (rejecting ineffective assistance of appellate counsel claim where petitioner failed to make the requisite showing that particular nonfrivolous issue was clearly stronger than issues that counsel did present).

Because Pagan has presented this claim on his petition for leave to appeal the denial of a new trial, and because he referred to federal law, this claim can be considered exhausted. (S.A. § C at C.A. 25.) Pagan fails, however, to demonstrate any non-frivolous claim that should have been raised by his appellate counsel. Pagan can show neither inadequate performance nor prejudice therefrom and thus his habeas petition may not be granted on this ground. *See Lattimore,* 311 F.3d at 57–58; *see also Thompson v. Spencer,* 111 Fed. Appx. 11, 14 (1st Cir.2004) (holding that appellate counsel's failure to raise meritless issues on appeal was neither unreasonable nor prejudicial).

### III.  CONCLUSION

For the foregoing reasons this Court DENIES Pagan's petition for the writ of habeas corpus.

SO ORDERED.